GERTRUDE JOHNSON, as Administratrix, etc., Claimant, v. THE STATE OF NEW YORK, Defendant. Claim No. 14672.

(State of New York, Court of Claims, September, 1918.)

**Highways — duty of state to protect automobile travel in night-time — damages — negligence.**

It is the duty of the state to protect the traveling public on its patrol system highways from dangers likely to arise from peculiar conditions surrounding a curve in a highway which

make it an extremely dangerous place for automobiles in the night-time.

The question of the dangerous condition of any particular place in a highway must .be answered in view of what may be expected from an ordinary driver under ordinary conditions in the use of the highway at that place.

Claimant's intestate, while driving his automobile in the night-time at from ten to fifteen miles an hour south along a highway under the state patrol system which was also a trunk highway leading into Pennsylvania where he had his home and to which he was returning, encountered a heavy fog, and having passed through a small hamlet instead of taking the curve to the left around a knoll known as " dug hill " he proceeded straight ahead and his car, in going over a retaining wall which was just beyond the outside curve of the road, turned turtle, fell on and killed him. The court on inspecting the curve at " dug hill " found it extremely dangerous for night driving when approaching from the north, and the evidence disclosed that this was not the first fatal accident at said curve. *Held,* that it was the duty of the state to provide some method to protect the ordinary auto traveler in the night-time, and that claimant was entitled to an award, as, had a suitable barrier been placed by the state at the curve, the accident might not have happened.

That being in the country with no facilities for putting up for the night the deceased was justified in proceeding through the fog on his way home and in the circumstances was using proper care.

CLAIM for damages for negligence in killing claimant's intestate while driving along a highway known as County Highway No. 28.

James O. Sebring, for claimant.

Henry P. Nevins, deputy attorney-general, for state of New York.

*Per Curiam.* This claim grows out of an accident which occurred August 4, 1916, at about one o'clock in the morning, in the town of Southport, Chemung

Misc.]    State of New York, Court of Claims, September, 1918.

county, N. Y.   The claimant's intestate, a resident of
the borough of Mansfield, Penn., was returning by
automobile from the city of Elmira, N. Y., to his home
in Mansfield.   Deceased was sitting in the front seat
of his own automobile and driving the same.   Mr. Owen
C. Osborne, one of his friends who also lived in Mans-
field, occupied the other front seat.   Deceased was
driving south along a highway known as county high-
way No. 28, which highway was under the state
patrol system, and had passed through the small
hamlet of Pine City when, for some reason, instead of
taking the curve to the left at " dug hill," the machine
proceeded substantially straight ahead over a stone
retaining wall which was just beyond the outside
curve of the road.   The machine in going over the
stone retaining wall turned turtle, fell on Mr. John-
son and killed him.

There are two questions in this case.

*First,* were the conditions at the curve at " dug
hill " such as to create so dangerous a place for
automobile traffic as to require a guard-rail or
barrier?

*Second,* was the claimant's intestate, at the time of
the accident, using due care in proceeding along the
highway at the point where the accident occurred?

The first question is easy of answer.   The court on
inspecting the curve at " dug hill " found it extremely
dangerous for night driving when approaching from
the north.   The evidence in the case disclosed that
this was not the first fatal accident at that curve.   The
peculiar conditions surrounding the curve make it an
extremely dangerous place for auto traffic in the night-
time.

When the present highway was constructed it was
lowered where it curved around a knoll known as
" dug hill."   This left a hill on the east side of the

road and a small bank on the west side. The road to the north of the curve ran nearly north and south. At the time of the construction of the present road a blacksmith shop was placed on the westerly side of the road at the curve. The shop was placed with its easterly face running north and south and substantially parallel with the center line of the road approaching from the north, the northeasterly corner of the shop being at the edge of the road and the southeasterly corner being some distance away from the road, as the road at this point curved to the east and away from the front of the shop. A stone retaining wall had been built on the outside of the curve from the southeasterly corner of the blacksmith shop to the edge of the road. This wall ran substantially east and west. The space between this retaining wall and the traveled portion of the highway was filled with earth to a level slightly above the center of the highway. This triangular space in front of the blacksmith shop, being continually driven upon and used by patrons of the blacksmith shop, had, in the night-time, the same appearance as the road itself. It was, to all appearances, a part of the road. A large tree on the outside of the curve was in line with the hill on the east side of the road. The blacksmith shop being about opposite the middle of the curve, and the face of the shop running north and south instead of running northwest and southeast, naturally led a driver into believing the highway ran on past the front of the shop in a southerly direction. The large tree on the left, being on the outside (right side) of the curve and in line with the hill on the east (left side) of the road, naturally led a driver to believe that the road went on beyond the tree and did not turn in between the tree and the hill. The dirt approach to the blacksmith shop, being of the same appearance as the road itself,

Misc.]    State of New York, Court of Claims, September, 1918.

naturally led a driver to believe that the road continued straight south past the front of the shop. These conditions were especially misleading at night. In the night-time with the ordinary auto lamps shining ahead, creating a sort of tunnel of light and leaving the space outside that tunnel in darkness, and that tunnel showing a clear fairway forward between the tree and the blacksmith shop over what appeared to be the roadway itself, and not disclosing the turn to the left until the machine was already into or past the turn, a combination of conditions obtained which might easily cause serious accidents.

The first question must be kept entirely separate from the second one. It is the state's duty to protect the traveling public on its patrol system highways from dangers of this character. Autos are now common means of transportation. This is a trunk highway leading into Pennsylvania. Autoists have the legal right to use this highway at night as well as in the daytime, and the question of the dangerous condition of any particular place in a highway must be answered, not in view of what some accident may have disclosed with respect to the conduct or negligence of the driver of the car which met with the accident, but in view of what might be expected from an ordinary driver under ordinary conditions in the use of the highway at that place.

It may be that the part of the retaining wall where the auto ran over it is outside the actual legal edge of the highway, but the wall is so close to the edge that, as far as autoists are concerned, for all practical intents and purposes, it might as well have been on the very edge itself.

Several methods might have been used to have properly protected this curve. Three could be mentioned readily. A suitable fence could have been

erected along the legal edge of the highway on the outside of the turn, and a gate provided in the fence for the use of the patrons of the blacksmith shop. Such a fence, painted white, would be a notice and a barrier in the night-time.  Of course, it would have been more inconvenient to the patrons of the blacksmith shop to have such a fence and gate instead of an open space along the roadside, but convenience is purchased at too dear a price when a barrier, which should be at the legal edge of the road, in view of the nearness of the retaining wall, is not provided. Clearly the duty of the town authorities when the road was first constructed, and the duty of the state authorities when they assumed control under the state patrol system, was to place this fence along the edge of the highway at this curve, or, if it was determined, for convenience sake, to do away with the fence at the legal edge of the highway, the duty immediately devolved upon those doing away with that fence to provide a similar fence or barrier from the southeasterly corner of the blacksmith shop along the top of the retaining wall to the big tree at the edge of the road.  Another method, as above mentioned, would be to erect a suitable barrier from the large tree on the outside of the curve to the corner of the blacksmith shop and paint this barrier white.  A third method would be to move the blacksmith shop a short distance to the easterly and about opposite the middle of the curve, and turn it so that it faced northeasterly.  In this latter case an autoist coming from the north in the night-time would see, in the rays of his headlight, the blacksmith shop squarely in his path and he would know a turn was there.  Any one of these three methods would have been inexpensive, and any one of the three would have already saved several lives.

Misc.]   State of New York, Court of Claims, September, 1918.

The conditions at " dug hill " curve are such that some method should be provided to protect the ordinary auto traveler in the night-time.  The state roads of New York state are used all summer long by travelers from all portions of the country.  They are not familiar with the dangerous curves.  They are usually traveling with their families.  They are entitled to be warned and protected against dangerous curves in highways.  In almost every town in the state there are certain curves which are well known to be  extremely dangerous for autoists.  Many accidents, some of them fatal, have happened at these curves.  The public authorities, state, county and town, charged with the care of highways, should protect the traveling public at such places by the erection of suitable barriers and signs.  Such public authorities must take into account the present automobile use of highways as well as the past horse and wagon use.

The question as to whether or not the claimant's intestate was using proper care at the time and place of the accident is a much more difficult one to answer.  It may be fairly found from the evidence that there was a dense fog at the time of and shortly before the accident; that Mr. Osborne, who was riding with Mr. Johnson, had stated to Mr. Johnson at a distance of from 1,000 to 1,500 feet northerly of this curve, " I am going to lie back and shut my eyes.  Don't forget that bad curve ahead; " that at the time Mr. Osborne closed his eyes the auto was going at the rate of about ten to fifteen miles an hour — running very slowly because of the dense fog; that not more than ten or fifteen feet of the highway ahead of the car could be seen through the fog; that Mr. Johnson was found dead with the steering wheel still gripped in his hands.

Mr. Johnson is not here to be cross-examined, and we can only determine what occurred by deduction.

26

State of New York, Court of Claims, September, 1918.   [Vol. 104.

The evidence shows that the car, proceeding southerly, passed almost in a straight line in the same direction on over the retaining wall. This would indicate, if he was awake and driving with reasonable care, that he did not know he was off the highway until substantially the instant the car pitched over the retaining wall. There is no evidence that he was not driving with reasonable care and there is evidence that he was driving with such care just before the accident. The auto was found upside down, pointed back toward Elmira, at a point from twelve to fourteen feet from the foot of the retaining wall. The retaining wall was about five feet high at that point. The auto being so close to the wall, being upside down and pointing toward Elmira indicates that the auto was not going rapidly at the time of the accident and that the deceased had not attempted to make any turn to the left on or past the curve. Apparently the auto did not roll down the bank sidewise or quartering, but passed directly over the bank head on and turned a half somersault directly forward. All these facts indicate that Mr. Johnson was in the place of danger without warning and without an opportunity to help himself until too late. From such facts as the evidence establishes it cannot be found that Mr. Johnson was driving carelessly or rapidly but, on the contrary, the few facts we have rather indicate that he was driving with a proper degree of care in view of the fog and the dangerous curve ahead.

Mr. Osborne states that he remembers nothing from the time he closed his eyes until he regained consciousness under the car, some little time after the accident.

Immediately the question arises — What is the duty of the driver of an auto under the circumstances mentioned? The driver was on his way home. He

Misc.]    State of New York, Court of Claims, September, 1918.

encountered this heavy fog. Did he have the right to proceed on his way through the fog, or did he owe a duty to himself to pull out to the side of the road and wait for the fog to lift or to stop and find lodging for the night, or to proceed ahead with caution commensurate with progress under those conditions? Being in the country, with no facilities for putting up for the night, we think Mr. Johnson was justified in proceeding through the fog on his way home. The sole question now remains — Was he using the degree of care which he ought to have used while proceeding on this highway through the fog at this place?

We do not wish to be understood as holding that the state assumes any insurance liability to protect travelers on the highway when such travelers attempt to proceed through a fog. But it seems plainly apparent that if a traveler does run into a fog in a valley, as this traveler did, and attempts to travel through the fog in that valley on his way to his home, he must of course assume certain risks if he chooses to proceed. But those risks should be only those which remain after the state has taken the precautions necessary to protect a traveler who is using the road under ordinary conditions in the night-time, exclusive of such fog conditions. It was not incumbent upon the state to protect this traveler from ordinary risks which he assumed by traveling through the thick fog, nor is that the holding in this case. But the state having failed to provide a fence or barrier at this dangerous curve, where failure was negligence with respect to a traveler traveling in the night-time even in the absence of fog, it was the absence of such barrier that permitted this traveler to drive off the embankment which at the point he left the highway was close to the edge of and within a very few feet of the legal edge of the highway. Had a suitable bar-

rier been placed at "dug hill" curve it would have prevented this traveler going over the retaining wall, even though he had been traveling in a dense fog in the night-time, as he was.

The deceased was thirty-six years of age. His wife was thirty-three years of age. They had two children, Lewellyn and Lester, aged thirteen and fifteen years, respectively. He conducted a barber shop in Mansfield, Penn. His expectancy was 13.987 years. The funeral expenses were $90. The damage to the auto was $300.

An award has been made herein in the sum of $8,390.

Ordered accordingly.